UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

NELLY AMAYA,

                Plaintiff,

    v.

BALLYSHEAR LLC,
GELLER & COMPANY LLC,
DIANE GUBELLI, MARIKA SYGMAN and
STEVE KACZYNSKI individually,

                Defendants.

---------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

17-cv-01596 (JS) (LGD)

FILED
CLERK

10:48 am, Jan 13, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**LEE G. DUNST**, Magistrate Judge:

    Plaintiff Nelly Amaya commenced this action on March 21, 2017.  Electronic Case File

Number ("ECF No.") 1.  Plaintiff alleges various forms of racial and sexual harassment by

Defendants[1] Ballyshear LLC, Steve Kaczynski, Marika Sygman, and against Defendants Geller

& Company LLC, and Diane Gubelli.  ECF No. 54.  As set forth in the current amended

complaint filed on April 2, 2019, Plaintiff specifically alleges (1) race discrimination pursuant to

42 U.S.C. § 1981 ("Section 1981"); (2) retaliation pursuant to Section 1981; (3) discrimination

and aiding and abetting pursuant to New York Executive Law § 296 (the New York State Human

Rights Law ("NYSHRL")); and (4) retaliation under the NYSHRL.  ECF No. 54.  Presently

before the Court, pursuant to the October 31, 2022 referral from the Honorable Joanna Seybert

---

[1]    Ballyshear LLC ("Ballyshear"), Steve Kaczynski, Marika Sygman, Geller &
Company LLC ("Geller"), and Diane Gubelli are hereinafter referred to collectively as
"Defendants" where applicable.  Ballyshear LLC and Geller & Company LLC are hereinafter
referred to as the "Corporate Defendants" where applicable.  Kaczynski, Sygman, and Gubelli
are hereinafter referred to as the "Individual Defendants" where applicable.  Ballyshear,
Kaczynski, and Sygman are referred to as the "Ballyshear Defendants" where applicable.  Geller
and Gubelli are referred to as the "Geller Defendants" where applicable.

for a Report and Recommendation, is the motion for summary judgment by the Ballyshear Defendants, ECF No. 102, and the motion for summary judgment by the Geller Defendants, ECF No. 103.[2]  As set forth below, the undersigned respectfully recommends that the Court GRANT the Ballyshear and Geller Defendants' motions for summary judgment and dismiss the case with prejudice.

## I.    FACTUAL BACKGROUND[3]

### A.    The Parties

Plaintiff Nelly Amaya is a forty-five year old Hispanic woman from Ecuador who moved to the United States in 2002.  ECF No. 130, ¶ 1; ECF No. 111-1, ¶ 2.  As of the date of the current complaint, she resides in Southampton, New York.  ECF No. 54, ¶ 8.

Defendant Ballyshear LLC is a New York domestic limited liability company that manages Michael R. Bloomberg's residence in Southampton, New York (the "Ballyshear Residence").[4]  ECF No. 54, ¶ 11; ECF No. 130, ¶ 2.

Defendant Geller & Company LLC provides strategic financial advisory, accounting, and wealth management services for various businesses, non-profits, high net worth individuals, and

---

[2]    Defendants also filed a Rule 56.1 Statement and supporting exhibits.

[3]    These facts are primarily based on the Rule 56.1 Statements provided by the parties at ECF Nos. 104, 109, and 130, as well as the documents submitted in support of the briefing papers at ECF Nos. 111, 119-27, and 131.  For background, the Local Civil Rules require motions for summary judgment to attach "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  The Local Civil Rules also require the nonmovant, here the Plaintiff, to file a statement with "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party . . . ."  Local Civil Rule 56.1(b).  All references herein to the Rule 56.1 Statements incorporate both the statements and the opposing parties' response, as well as all citations referenced therein.

[4]    Mr. Bloomberg is the Chief Executive Officer of Bloomberg LP (*see* ECF No. 130, ¶ 6).  The Court also takes judicial notice that he is the former New York City Mayor.

families.  ECF No. 54, ¶ 9; ECF No. 55, ¶ 9.  Geller provides such services for Mr. Bloomberg

and his properties.  ECF No. 54, ¶ 10; ECF No. 130, ¶¶ 126-28.  The parties agree that Geller

provides human resource support to its clients.  ECF No. 130, ¶ 3.  Geller's office is located in

New York, New York.  ECF No. 130, ¶ 4.

Ballyshear engaged Geller to provide a variety of services, including accounting, payroll,

and human resources support.  ECF No. 130, ¶ 22.  However, the parties disagree about the

nature of relationship between Ballyshear and Geller and whether Ballyshear employees are also

employees of Geller.  ECF No. 130, ¶ 9.  The parties also dispute (1) whether Geller and

Ballyshear share any common ownership or personnel; (2) whether Geller's policies for its

employees also apply to Ballyshear employees (and whether Ballyshear policies apply to Geller

employees); (3) whether Geller hires, fires, and oversees Ballyshear employees; and (4) how

often Geller representatives visited Ballyshear.  ECF No. 130, ¶¶ 6, 8, 22, 24, 154-66.  However,

the parties agree that Plaintiff did not interact directly with any Geller representative between

December 8, 2014 and April 27, 2015.  ECF No. 130, ¶ 92.  Subsequently, in July 2015, Plaintiff

did meet with Geller representatives to discuss her employment at Ballyshear.  ECF No. 130, ¶

145.

Defendant Diane Gubelli is a partner at Geller.  ECF No. 130, ¶ 5.  Plaintiff did not

interact directly with Gubelli between December 8, 2014 and April 27, 2015.  ECF No. 130, ¶

92.

Defendant Maria "Marika" Sygman is the property manager of the Ballyshear Residence

and was Plaintiff's supervisor.  ECF No. 130, ¶ 12; ECF No. 111-1, ¶ 12.  The parties disagree

whether Sygman was solely responsible for oversight of Ballyshear employees.  *Id.*  Defendants

claim the evidence shows Sygman did oversee all Ballyshear employees, whereas Plaintiff states

3

Geller oversaw all Ballyshear employees. *Id.* Notably, Plaintiff concedes that Sygman was her manager. ECF No. 102-5 at 155:15-16; ECF No. 111-1, ¶ 12.

Defendant Steve Kaczynski is the groundskeeper of the Ballyshear Residence. ECF No. 130, ¶ 13. The parties dispute whether Kaczynski was Plaintiff's manager and whether he had supervisory authority over her.[5] ECF No. 130, ¶¶ 13, 16.

Finally, there are several non-parties who are relevant to the allegations in this action and also worked at the Ballyshear Residence during Plaintiff's employment there: (1) Jennifer Roldan who worked as a housekeeper, ECF No. 130, ¶ 18; (2) Josephine Barrera who also worked as a housekeeper, ECF No. 130, ¶ 19; and (3) Jeffrey Ingram who worked as the golf superintendent. ECF No. 130, ¶ 20.

### B.    Plaintiff's Employment at the Ballyshear Residence

Plaintiff began working as a housekeeper at the Ballyshear Residence on or around December 8, 2014. ECF No. 130, ¶ 25. At the time Ballyshear hired Plaintiff (a citizen of Ecuador), she was authorized to work in the United States pursuant to a legal work permit that required renewal every two years. ECF No. 130, ¶ 29. The parties dispute whether Plaintiff worked exclusively for Ballyshear or was also employed by Geller. ECF No. 130, ¶ 26. Sygman served as Plaintiff's supervisor, but the parties dispute whether Plaintiff had additional supervisors and whether anyone from Geller (including Defendant Gubelli) also supervised Plaintiff. ECF No. 130, ¶¶ 27-28.

---

[5]    Plaintiff stated in her deposition that although Kaczynski did influence Sygman, and "he had some type of control," he wasn't her manager. ECF No. 102-5, at 153-55 (Q: My question is, was he your manager? A: No, she [sic] wasn't our manager. Marika was. . . . And that's something Marika left very clear."). Plaintiff's *Declaration*, however, claims, "Ms. Sygman made me believe that Mr. Kaczynski was a manager because she told me on several occasions that Mr. Kaczynski was a manager and had authority over the other employees, including myself." ECF No. 111-1, ¶ 13; *see also* ECF No. 131-31 (Defendants' declaration exhibit highlighting the inconsistencies on this disputed fact).

On April 27, 2015, Plaintiff was working at the Ballyshear Residence and, while carrying vases, fell down the flight of stairs from the kitchen to the basement.  ECF No. 130, ¶¶ 30-31. The parties dispute the circumstances around this fall.  ECF No. 130, ¶ 31.  Defendants assert Plaintiff was speaking on a cellphone to her husband before falling, whereas Plaintiff denies this. *Id.*  Further, the parties dispute what occurred immediately preceding the fall, namely whether alleged stresses, disputes, or discriminatory/retaliatory conduct distracted or frustrated Plaintiff to the degree that it contributed to her fall down the stairs.  ECF No. 130, ¶¶ 32-34; 291.

After the incident on April 27, 2015, Plaintiff did not return to work as a housekeeper at the Ballyshear Residence.  ECF No. 130, ¶ 35.  Ballyshear continued to pay Plaintiff her full salary for approximately eight weeks, followed by half salary for approximately four weeks, after her fall.  ECF No. 130, ¶ 36.  On September 3, 2015, Ballyshear terminated Plaintiff's employment.  ECF No. 136, ¶ 329.

### C.    Alleged Discrimination and Retaliation Against Plaintiff

Plaintiff prepared an undated outline of events that allegedly occurred during her time working at the Ballyshear Residence.  ECF No. 130, ¶ 37.  Some of the allegations against Defendants outlined below were included on this timeline.

During her time working at the Ballyshear Residence, Plaintiff alleges that Kaczynski made disparaging comments about "illegal" immigrants, Latinos, and Plaintiff (including allegedly asking "if she had papers to be in this country legally").  ECF No. 130, ¶¶ 43; 212. Specifically, she claims Kaczynski called Plaintiff and Latinos "illegal" and said he was "tired of the 'illegals'" and would "point[] to his wallet," and say they were "living off his money because they didn't pay taxes. They were living off the government. They were just taking advantage." ECF No. 130, ¶ 44.  The parties dispute how frequently these comments were made, although

Plaintiff testified Kaczynski made these comments on multiple occasions.  ECF No. 130, ¶ 47; ECF No. 119-4 at 403:3-22.  Plaintiff claimed that Kaczynski "always" made these remarks "every single time [they] ate together," which occurred multiple times per week.  ECF No. 130, ¶ 50.  Plaintiff further alleges that after she provided drinks to painters working at the Ballyshear Residence, Sygman asked Plaintiff to hang a sign in Spanish stating, "Do not drink water from here."  ECF No. 130, ¶ 51.  Plaintiff also alleges that she "complained" to Sygman about Kaczynski's race-related remarks on multiple occasions.  ECF No. 130, ¶¶ 61-69.  Sygman testified she did not recall Plaintiff ever reporting Kaczynski making racist remarks.  ECF No. 130, ¶ 105.  Kaczynski testified that he did not refer to Plaintiff as "illegal."  ECF No. 130, ¶ 113.  Ingram testified that he did not recall hearing Kaczynski making any racially offensive comments, but did recall an instance where Kaczynski said it "wasn't fair for illegals to be compensated for their activities."  ECF No. 130, ¶¶ 119-20.

Plaintiff further alleges numerous instances of unwarranted sexual comments and gestures when she was employed at the Ballyshear Residence.  Plaintiff claims that non-parties Roldan and Barrera would "constantly" discuss their sex lives and on multiple instances made sexual gestures, sexual comments, inquire into Plaintiff's sex life, and talk about Plaintiff's body and their bodies.  ECF No. 130, ¶¶ 52-53.  Plaintiff states that she was very uncomfortable with these interactions and said so to them.  ECF No. 130, ¶ 54.  Plaintiff further alleges that Kaczynski made inappropriate remarks including that he was "watching pornography" (the parties dispute whether Sygman reprimanded him for his comments) and used the word "bitch" or "bitches" on numerous occasions (the parties appear to dispute how frequently this term was used and where it was directed).  ECF No. 130, ¶¶ 55-60.  Plaintiff alleges she "complained" to Sygman about Roldan, Barrera, and Kaczynski's sex-based comments on multiple occasions and

also "complained" about Kaczynski's use of the term "bitch." ECF No. 130, ¶¶ 72-77. Plaintiff testified that Sygman told Plaintiff to stick up for herself or have a further discussion with Sygman if coworkers were making inappropriate comments. ECF No. 130, ¶ 256. Sygman testified she did not recall Plaintiff saying that anyone was making sexual comments. ECF No. 130, ¶ 108. However, Sygman did testify that she spoke to Kaczynski regarding his use of the term "bitch." ECF No. 130, ¶ 109.[6] Kaczynski testified that Sygman reprimanded him for using the term "bitches" and told him "it was unacceptable behavior." ECF No. 130, ¶ 115. Kaczynski testified that he subsequently apologized to Plaintiff for his remarks. ECF No. 130, ¶ 116.

Towards the end of her time at the Ballyshear Residence, Plaintiff decided to report her "complaints" to human resources. ECF No. 130, ¶¶ 78-80. Plaintiff alleges that in February 2015, she told Roldan she would make a report. ECF No. 130, ¶ 83. According to Plaintiff, there was a rumor that Sygman and Kacyznski were having an affair (an allegation disputed by Defendants). ECF No. 130, ¶¶ 81-82. The parties dispute whether Plaintiff was going to report the alleged affair between Sygman and Kaczynski (which she stated in her deposition), or whether she was also going to report the alleged discriminatory conduct. ECF No. 130, ¶¶ 83, 91; ECF No. 111-1, ¶ 70 (Plaintiff's Declaration claims her complaint was going to focus on the racial discrimination by Kaczynski).

After apparently learning that Plaintiff was planning a report to human resources with complaints including the purported affair between Sygman and Kaczynski, Sygman allegedly "changed totally" towards Plaintiff. ECF No. 130, ¶¶ 84-85. According to Plaintiff, after Sygman learned Plaintiff was planning to make a complaint to human resources, Sygman held a

---

[6] Sygman does not recall telling anyone at Geller about Plaintiff's complaints. ECF No. 130, ¶ 348.

meeting with various employees (including Plaintiff), where she allegedly said that "[i]f anyone wants to lodge a complaint with human resources they had better have a good excuse, because I am going to stand at the door and watch how Mr. Bloomberg kicks their asses and it is other people who take off [sic]."[7]  ECF No. 130, ¶ 86.  Sygman denies making this statement.  ECF No. 130, ¶ 110.  Plaintiff also alleges that at a meeting (the parties appear to dispute whether it was the same meeting as referenced in ECF No. 130, ¶ 86) after learning Plaintiff would go to human resources with a complaint, Sygman asked every worker "if they had a complaint" and "everyone was interrogated . . . and they said they did not have any complaint."  ECF No. 130, ¶ 87.

Plaintiff alleges that as a result of her plan to make a complaint to human resources, Sygman retaliated against her.  ECF No. 130, ¶ 90.  The alleged retaliation includes "Sygman revoked Plaintiff's 'incentive' to do grocery shopping and use the Citarella card."[8]  *Id.*  In her Declaration, Plaintiff claims that Sygman "became excessively critical of my performance, had me perform demeaning tasks, and made a complaint against me to human resources."  ECF No. 111-1, ¶ 73.  In her Declaration, Plaintiff further alleges Sygman had her perform demeaning tasks such as "put on [Sygman's] shoes or jacket for her."  ECF No. 111-1, ¶ 75.  Plaintiff alleges that she overheard a conversation between Sygman and someone from Geller, who asked, "is Nelly still causing problems?"  ECF No. 111-1, ¶ 74.

Plaintiff testified that after her fall down the basement stairs at the Ballyshear Residence on April 27, 2015, Sygman and Kaczynski appeared at her house and made statements which she

---

[7]      Plaintiff's Declaration states the quotation as "if anyone goes to HR, see how far you fly when Mr. B[loomberg] kicks your ass out the door" and Ms. Sygman allegedly looked at Plaintiff and said, "my boss is not going to listen to any nonsense."  ECF No. 111-1, ¶ 64.

[8]      Sygman had previously trusted Plaintiff with the Citarella grocery credit card for the property.  ECF No. 130, ¶ 205.

interpreted as them asking her not to expose their alleged affair.  ECF No. 130, ¶ 301.  Plaintiff's Declaration submitted in support of her Opposition to the Motion for Summary Judgment further explains that after her fall, non-party Janine Wheaton, a Geller employee responsible for providing human resources services to Ballyshear employees, contacted her to ask her about her injuries.  ECF No. 111-1, ¶ 105.  She explained to Wheaton that her fall was due to the ongoing discriminatory conduct and she wanted to meet in person.  ECF No. 111-1, ¶ 106.  Plaintiff alleges that, on or around June 12, 2015, Wheaton called her to inform her that they were going to stop paying her because her work authorization was set to expire; Plaintiff claims she informed Wheaton that she renewed her work authorization and submitted the paperwork so she could get paid.  ECF No. 111-1, ¶ 107.  Plaintiff explains she met with Wheaton, Gubelli, and an interpreter on July 14, 2015 and explained the "dehumanizing, discriminatory comments from Mr. Kaczynski, Ms. Roldan, and Ms. Barrera on the basis of my sex, race, and national origin and that I had already raised all of these complaints to Ms. Sygman."  ECF No. 111-1, ¶ 109. Plaintiff alleges they were disinterested in her allegations, and she explained to Gubelli that she wanted to return to work with fair treatment.  ECF No. 111-1, ¶¶ 112-14.  Then, Plaintiff later repeated her complaints with Wheaton, Gubelli, and others in another meeting on July 27, 2015. ECF No. 111-1, ¶ 118.  Following the meeting, Gubelli gave plaintiff a proposed settlement agreement.  ECF No. 111-1, ¶ 119.  Plaintiff claims that she asked to be transferred, but Gubelli said she could either return to her previous work or sign the agreement.  *Id.*  A July 28, 2015 email by Wheaton explains confusion around what Plaintiff was asking for, and speculated, "[i]f I had to guess, I'm thinking she just wants us to pay her forever but not expect her to return to work any time soon though she is very unhappy in this position."  ECF No. 130, ¶ 316.  Around August 2015, Gubelli notified Plaintiff that her disability was ending and she would need further

documentation to continue it.  ECF No. 111-1, ¶ 120.

Plaintiff alleges that Gubelli did not investigate Plaintiff's complaints, whereas witnesses including Gubelli and Wheaton testified that they conducted an investigation into Plaintiff's claims of discriminatory conduct and found them to be unfounded.  ECF No. 130, ¶ 317; ECF No. 131-1, at 180:5–181:3 and 187:4–10.

On September 3, 2015, Geller terminated Plaintiff's employment.  ECF No. 111-1, ¶ 122. Plaintiff alleged that Geller retaliated against Plaintiff for making the complaints by failing to renew her work authorization and waiting until the day before the work authorization was about to expire to threaten to terminate her employment if not renewed.  ECF No. 130, ¶ 93.[9] Defendants argue that Geller had no responsibility to assist Plaintiff with her work permit renewal.  ECF No. 130, ¶ 305.  The parties agree that Plaintiff was able to get her work authorization renewed on her own.  ECF No. 130, ¶ 306.  Defendants argue that her termination, occurring over four months after her fall, occurred because of the inability of Defendants to determine when Plaintiff would return to work.  ECF No. 30-3.

## II.    PROCEDURAL HISTORY

On May 4, 2016, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity ("EEOC"), alleging discrimination and retaliation based on her sex, national origin, and disability.  ECF No. 103-5.  After a review of Plaintiff's claims, the EEOC stated that it was "unable to conclude that the information establishes a violation of Federal law on the part of [Ballyshear]," but that "this does not certify that Respondent is in compliance with the statutes." ECF No. 125-2.

---

[9]    The claims initially brought by Plaintiff for wrongful termination on similar facts were dismissed by Judge Arthur D. Spatt.  ECF No. 35, at 16-19.  Judge Spatt also held that the circumstances around her termination did not constitute a claim for retaliation.  ECF No. 35.

On March 21, 2017, Plaintiff commenced this action.  ECF No. 1.  On July 28, 2017, Plaintiff filed an Amended Complaint, setting forth six causes of action including discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") against the Corporate Defendants; retaliation under Title VII against the Corporate Defendants; discrimination under NYSHRL against the Corporate Defendants and the Individual Defendants[10]; retaliation under NYSHRL against the Corporate Defendants and the Individual Defendants; aiding and abetting under NYSHRL against the Corporate Defendants and the Individual Defendants; and discrimination and retaliation under Section 1981 against the Corporate Defendants and Individual Defendants.  ECF No. 20.  Defendants moved to dismiss the Amended Complaint.  ECF No. 30.

On March 14, 2018, Judge Arthur D. Spatt dismissed certain claims, including wrongful termination, retaliatory discharge, and constructive discharge pursuant to Section 1981 or the NYSHRL.  ECF No. 35.  Judge Spatt allowed claims based on a hostile work environment, pursuant to the NYSHRL, a workplace retaliation theory pursuant to the NYSHRL, and a hostile work environment and retaliatory workplace theory pursuant to Section 1981 to proceed against the Defendants.  *Id.*  Notably, Judge Spatt held that Plaintiff "was not exposed or subjected to the alleged harassment, discrimination and retaliation that she endured while working at the Property *after* [April 25, 2015]."  *Id.* at 15 (emphasis added).

On April 24, 2018, Plaintiff filed a Second Amended Complaint.  ECF No. 43. Defendants filed a Motion to Dismiss and to Strike Certain Factual Allegations.  ECF No. 44. On November 20, 2018, Judge Spatt granted the motion, striking certain allegations and ordered Plaintiff to revise her complaint as to the Section 1981 and NYSHRL causes of action to include

---

[10]    At the time of that decision, the claims included an additional individual defendant.

only claims relevant to a workplace retaliation and hostile work environment theory.  ECF No
48.

On March 8, 2019, Plaintiff filed a Third Amended Complaint.  ECF No. 50.  On March
27, 2019, the parties jointly sought the Court's permission to file a Fourth Amended Complaint,
which was granted on March 28, 2019.  ECF No. 52.

Finally, on April 2, 2019, Plaintiff filed the Fourth Amended Complaint, which is the
operative complaint at issue.  ECF No. 54.[11]  Plaintiff (who worked at the Ballyshear Residence
for approximately nine months) is seeking approximately $54 million in damages, including lost
wages, physical ailments, emotional distress, punitive damages, legal fees, and costs.  ECF No.
130, ¶¶ 96-97.  Defendants answered on April 22, 2019.  ECF No 55.

On August 1, 2022, the Ballyshear and Geller Defendants filed separate motions for
summary judgment.  ECF Nos. 102 and 103.  Plaintiff filed her opposition on September 21,
2022 and September 26, 2022, ECF Nos. 110 and 118, and the Ballyshear and Geller Defendants
filed their replies in support of the motions on October 28, 2022, ECF Nos. 128 and 129.  On
October 31, 2022, the Honorable Joanna Seybert referred the motions for summary judgment to
the undersigned for a Report and Recommendation.  Oct. 31, 2022 Order.

## III.    LEGAL STANDARDS

### A.    <u>Summary Judgment</u>

Rule 56(a) of the Federal Rules of Civil Procedure states that a "court shall grant
summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[11]    As noted above, Plaintiff currently alleges (1) race discrimination pursuant to 42
U.S.C. § 1981; (2) retaliation pursuant to 42 U.S.C. § 1981; (3) discrimination and aiding and
abetting pursuant to the NYSHRL; and (4) retaliation under the NYSHRL.  ECF No. 54.
Defendants request summary judgment on all claims.  *See* ECF Nos. 102 and 103.

and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" *Marvel Characters*, 310 F.3d at 286 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate. *Anderson*, 477 U.S. at 249. "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 252). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Id.* (citing *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

Further, the Second Circuit has explained, in an employment discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Because direct evidence of discriminatory intent is rarely available, "affidavits and

depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id*. However, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148-49 (2000)).

**B.     42 U.S.C. § 1981**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . ." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. § 1981(b). Courts have held that Subsection (c) "explicitly applies Section 1981 to private discrimination." *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 301 (2d Cir. 2006). Further, "individuals may be held liable under § 1981." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000). In order to hold individuals liable, a plaintiff must show "some affirmative link to causally connect the actor with the discriminatory action" and "must be predicated on the actor's personal involvement." *Id.* (internal quotations and citations omitted).

**C.     NYSHRL[12]**

New York State Executive Law § 296(1) (as part of the New York State Human Rights Law "NYSHRL") provides that "[i]t shall be an unlawful discriminatory practice: (a) [f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital

---

[12]     Although not materially different for purposes of this Court's analysis, these cited portions are from the version of the statute that was effective between December 29, 2014 and November 21, 2015, the time period of the allegations in the complaint. ECF No. 54, ¶ 38-132.

status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

Further, New York State Executive Law § 296(6) prohibits aiding and abetting the discrimination prohibited in § 296(1) as, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

Finally, New York State Executive Law § 296(7) prohibits retaliation in response to opposing discrimination: "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

## IV.    DISCUSSION

The Ballyshear and Geller Defendants seek summary judgment in their favor on the following grounds, primarily that (1) the alleged behavior did not create a hostile work environment and was not based on Plaintiff's race or gender; (2) there were substantial inconsistencies among Plaintiff's testimony, EEOC charge, complaint, drafted timeline, and declaration; (3) there is no basis to impute the alleged harassment to Ballyshear; (4) Geller was not Plaintiff's employer; and (5) no one at Geller harassed or retaliated against her.  These grounds and other issues are addressed below.

### A.    Hostile Work Environment Under Section 1981

"In order to establish a hostile work environment claim under 42 U.S.C. § 1981, a plaintiff 'must show that the workplace was so severely permeated with discriminatory

intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.'" *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723–24 (2d Cir. 2010) (quoting *Alfano v. Costello*, 294 F.3d 365, 373–74 (2d Cir. 2002)). The test is both objective and subjective: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Isbell v. City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015)). The offending incidents must be "more than episodic" and "sufficiently continuous and concerted in order to be deemed pervasive." *Littlejohn*, 795 F.3d at 321 (citation omitted). "The conduct must also be because of the plaintiff's race." *Watkins v. New York City Transit Auth.*, No. 16 CIV. 4161 (ER), 2020 WL 1888839, at *8 (S.D.N.Y. Apr. 16, 2020), *aff'd*, No. 19-286-CV, 2021 WL 2099229 (2d Cir. May 25, 2021) (internal citations omitted); *see Patane v. Clark*, 508 F.3d 106, 112-14 (2d Cir. 2007) (explaining that a hostile work environment claim must show discrimination "because of" a protected characteristic). Such allegations are considered with respect to the totality of the circumstances, namely "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *Littlejohn*, 795 F.3d at 321. "A plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" *Alfano,* 294 F.3d at 373–74. Further, "[w]hen the harassing employee is a non-supervisory coworker, the employer is vicariously liable only if a plaintiff can prove the employer 'provided no reasonable avenue for complaint or knew of the harassment but did

nothing about it.'" *Watkins*, 2020 WL 1888839, at *8 (citing *Charley v. Total Office Planning Servs. Inc.*, 202 F. Supp. 3d 424, 429 (S.D.N.Y. 2016)).

Here, the facts are insufficient to establish a claim for a hostile work environment pursuant to race-based employment discrimination under Section 1981. Plaintiff claims Ballyshear employees (primarily Kaczynski) made numerous race-based comments in the presence of Plaintiff and Sygman, but Ballyshear and Geller took no significant action to stop these racial epithets. ECF No. 118, at 17-22; *see* ECF No. 110, at 15 (arguing the knowledge of Sygman should be imputed to Geller, as Ballyshear and Geller were a single employer). Plaintiff provides numerous examples of the alleged race-based statements including (but not limited to):[13]

> Starting around Plaintiff's first week of employment, Kaczynski called Plaintiff "illegal" and asked Plaintiff if she had papers. (Pl. 56.1 ¶ 212-215, 345, 66.) [P]laintiff immediately saw her direct supervisor, Sygman condone such behavior and only tell Kaczynski that everyone must have papers to work at Ballyshear. (Pl. 56.1 ¶ 56). Throughout Plaintiff's employment Kaczynski subjected Plaintiff to the following racial epithets on a constant, continuous basis: calling Plaintiff an "illegal" (Pl. 56.1 ¶ 217, 247); saying [L]atinos were illegal, (Pl. 56.1 ¶ 217, 247); that he was tired of illegals (Pl. 56.1 ¶ 217, 66.); "Latinos had no rights to be in this country you are taking my money." (Pl. 56.1 ¶ 216, 218); "You are coming here to my country, to my city" (Pl. 56.1 ¶ 218); would "point[] to his wallet," and say they were "living off his money because they didn't pay taxes. They were living off the government. They were just taking

---

[13]    Although Courts ordinarily do not consider credibility issues on summary judgment, the Court notes there are significant allegations apparently raised for the first time in Plaintiff's Declaration. *See* ECF No. 130, ¶ 284. For example, Defendants argue that Plaintiff's Declaration for the first time argues that Kaczynski and Roldan suggested Ballyshear could "deport [her] if they wanted to." ECF No. 129, at 5-6. In addition, the Declaration at ECF No. 111-1 includes a number of statements which Defendants argue contradict prior testimony (*see* ECF No. 131-31). In light of these arguments, Defendants argue there is sufficient cause to grant summary judgment due to these inconsistencies. *See* ECF No. 102-1, at 8-9. In this case, the Court does not find that the testimony is so contradictory and incomplete to be a reason for granting summary judgment; to be clear, the Court has not factored an assessment of the credibility of the evidence presented in this Report and Recommendation. However, the Court does note that Plaintiff's Declaration at ECF No. 111-1 *does appear* to raise certain allegations for the first time and includes statements that do appear inconsistent with her prior testimony.

>advantage" (Pl. 56.1 ¶¶ 44-45, 48-49); "that it wasn't fair for illegals to be compensated for their activities" (Pl. 56.1 ¶ 120); Hispanic women only come to the United States to reproduce and live off the government (Pl. 56.1 ¶ 281-282); Spanish-speaking people routinely leave medical bills unpaid and Kaczynski was surprised Plaintiff had insurance. (Pl. 56.1 ¶ 226). Kaczynski said the Spanish people who all come here and have babies so they can stay in this country. (Pl. 56.1 ¶ 66).

ECF No. 118, at 18-19.

Courts considering similar facts have held such statements do not rise to the level of an objectively hostile work environment sufficient to prove a violation of Section 1981.  Plaintiff does not allege any statements that were extraordinarily severe or involved physically threatening conduct.  *See Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 1:20-CV-6199-GHW, 2022 WL 973861, at *11 (S.D.N.Y. Mar. 30, 2022) (granting summary judgment to dismiss a Section 1981 claim where a defendant made explicitly racist comments, but they did not rise to a level that was sufficiently severe or pervasive). In *Abalola*, the court held that although the alleged comments were offensive (as they are here), they were not sufficiently continuous and concerted to be deemed pervasive.  *Id.* The *Abalola* court relied on numerous cases that are useful for addressing the facts at issue in this case:

>"For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp* [*v. Town of Avon,* 118 F. 3d 106, 110 (2d Cir. 1997)] (citations, alteration, and internal quotation marks omitted). "[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110–11 (citations and internal quotation marks omitted). . . . *Obi v. Westchester Med. Reg'l Physician Servs., P.C.*, No. 19-CV-3022, 2020 WL 1434159, at *8 (S.D.N.Y. Mar. 23, 2020) (holding that three comments made over two years to the plaintiff "that she should keep quiet because of her race; that she could not ask a white, Jewish doctor for assistance; and that as a 'black African,' she should go

back to her 'poor country' . . . objectively rise to the level of racial hostility, but are not severe or pervasive enough to sustain a hostile work environment claim"); *Mills-Sanchez v. Rsch. Found. for State Univ. of N.Y.*, No. 1:18-CV-723, 2019 WL 2549726, at *10 (N.D.N.Y. June 20, 2019), *aff'd sub nom. Mills-Sanchez v. State Univ. of N.Y. Rsch. Found.*, 820 F. App'x 63 (2d Cir. 2020) ("[C]onsidering the . . . allegations involving a few race-related remarks that are alleged to have occurred intermittently over the span of six years—the harassment experienced by plaintiff was not severe or pervasive enough to constitute a hostile work environment."); *Sanchez Day v. N.Y.C. Dep't of Consumer Affairs*, No. 10-CV-4888, 2016 WL 1070843, at *5 (S.D.N.Y. Mar. 15, 2016) (holding that the use of a slur two to four times in an eighteen-month period did not amount to a hostile work environment); *Lewis v. City of Norwalk*, 562 F. App'x 25, 28 (2d Cir. 2014) (summary order) (holding that "overtly sexual conduct" that "occurred only sporadically over time, and no more than a few times a year" was insufficient to establish a hostile work environment). . . . *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'")

*Id.* at *11-12. Plaintiff's allegations here regarding the comments in the workplace (while offensive) do not rise to the high level to demonstrate an objectively unreasonable work environment.

Plaintiff further alleges that this race discrimination altered her work environment because she was unable to focus on her work, she allegedly suffered psychological stress and harm, and it may have contributed to her fall in April 2015. *See* ECF No. 118, at 19. The Court does not find any evidence that the alleged race-based comments altered her performance, nor clear facts to support a connection between these statements and her fall in April 2015.

Finally, in light of the Court's finding that there is no actionable claim for a hostile work environment against the Ballyshear Defendants under Section 1981, the Court recommends that these claims also be dismissed as to the Geller Defendants, as

there is no actionable claim that could potentially be imputed to them.

## B.      Retaliation Under Section 1981

"Retaliation claims under § 1981 proceed under the three-step *McDonnell Douglas* burden-shifting framework and are analyzed pursuant to the principles applicable to retaliation claims under Title VII." *Abalola*, 2022 WL 973861, at *12. First, Plaintiff must show retaliation. *Id.* (citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)). To demonstrate a *prima facie* case of retaliation, Plaintiff must show: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (internal quotations omitted). If Plaintiff can show a *prima facie* case of retaliation, then the employer "must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Fincher*, 604 F.3d at 720. In considering this three-part test on summary judgment, a court should "determine whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Whitley v. Montefiore Med. Grp.*, No. 13-CV-4126, 2016 WL 1267788, at *10 (S.D.N.Y. Mar. 30, 2016) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

Further, the alleged adverse action must be "materially adverse," (rather than "trivial harms") in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Fincher*, 604 F.3d at 721 (internal quotations

omitted).  Courts will look to context of the alleged adverse acts to determine whether they sufficiently show injury or harm.  *Hicks*, 593 F.3d at 165.  In considering such context, courts may look to the "temporal proximity" between the employer's knowledge of the protected activity and the adverse action.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (stating that the time between the employer's knowledge of the protected activity and the adverse action must be "very close").

Here, Plaintiff fails to show facts that could result in a reasonable jury finding retaliation by Defendants under Section 1981.  Plaintiff claims that she engaged in multiple protected activities from January 2015 to April 27, 2015, including several complaints to Sygman about Kaczynski's allegedly racially discriminatory remarks.  ECF No. 118, at 24.  She asserts that as a result, she suffered numerous adverse employment actions, including a purported note to Mr. Bloomberg, a discussion between Sygman and a Geller representative regarding Plaintiff, allegedly requiring Plaintiff to perform demeaning tasks such as putting on Sygman's shoes and jacket for her, Sygman taking away her Citarella grocery credit card, and Sygman commenting on Plaintiff's weight. ECF No. 118, at 25-27.  The Court does not find any of these examples to be any clear example of adverse harm or any clear connection to the purported "complaints." Furthermore, the Court does not find these examples to rise to the level of harm or injury that would be required for a claim of retaliation.  *See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568, 568 (2d Cir. 2011) ("'trivial harms'—i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse" (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *Alter v. Rocky Point Sch. Dist.,* No. 13 CV

1100 (JMA) (AKT), 2017 WL 10409996, at *13 (E.D.N.Y. Jan. 12, 2017) (finding that

"a handful of diminished job responsibilities and other miscellaneous changes" did not

constitute retaliation).

 Plaintiff further notes additional potential examples of adverse employment

actions, including the alleged failure to assist Plaintiff with her work authorization

documents;[14] threats to terminate employees who went to human resources with

complaints; a visit by Sygman and Kaczynski to Plaintiff's home after her fall; alleged

statements by Kaczynski and Roldan that Geller and Ballyshear could deport her if they

wanted; and her ultimate termination.  ECF No. 118, at 26-27.  However, these

allegations fail to withstand Defendants' motions for summary judgment.

 First, some of these allegations – including Sygman and Kaczynski's visit to

Plaintiff's home and her termination – are *outside* the relevant time period of this case as

previously limited by Judge Spatt to April 27, 2015, when Plaintiff stopped working with

Defendants and was no longer paid her salary (as she was on medical leave).[15]  ECF No.

35, at 15 (citing *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-cv-243,

2014 WL 3867560, at *10 (E.D.N.Y. July 29, 2014) (explaining that evidence of a hostile

work environment must be based on evidence of harassment in the "workplace," and not

when an employee is on leave)).  However, even considering the allegations after her fall

in favor of Plaintiff, the Court does not find any credible evidence to view any of these

---

[14] As noted above, Defendants argue they were not obligated to assist Plaintiff with her work authorization, and the parties agree she succeeded in extending her authorization without their assistance.  ECF No. 130, ¶¶ 305-06.

[15] The Rule 56.1 Statement (ECF No. 130, ¶¶ 30, 35) submitted by the parties states that Plaintiff's fall and last day at the Ballyshear Residence was April 27, 2015, whereas Judge Spatt's opinion uses April 25, 2015 as the date she stopped working at the Ballyshear Residence.

examples as being material or caused by Plaintiff's protected activities. The Court does not find evidence to support the claim that Defendants failed to assist her with her work authorization due to any protected activity. The Court also does not find evidence to suggest the alleged statements of Kaczynski or Sygman at her home were made in order to deter Plaintiff from reporting any discriminatory conduct. The Court does find evidence to support the allegation that Sygman may have attempted to dissuade employees from making a complaint to human resources. *See* ECF No. 130, ¶ 86. The evidence however appears to support that Sygman held this meeting to deter the reporting of any alleged affair between her and Kaczynski, not to deter Plaintiff from making a claim regarding a hostile work environment. *Id.* Notably, these alleged threats by Sygman were not accompanied by action and did not deter Plaintiff from ultimately making a complaint to human resources. *Vazquez v. Southside United Hous. Dev. Fund Corp.*, No. 06-CV-5997(NGG)(LB), 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009) (stating that empty threats do not cause injury and are not materially adverse without action). Finally, Defendants offer a non-retaliatory explanation for her termination in September 2015 – the inability to determine if she would be returning from leave. *See* ECF No. 30-3.

C.    **Plaintiff's NYSHRL Harassment and Aiding and Abetting Claims**

Claims under the NYSHRL for harassment and a hostile work environment are analyzed similar to the Section 1981 claims. *See Zheng-Smith v. Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 623 (E.D.N.Y. 2020), *aff'd*, No. 20-3544-CV, 2021 WL 4097316 (2d Cir. Sept. 9, 2021). As explained above, "a hostile work environment claim requires a showing first that 'the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment,' and

second that 'a specific basis exists for imputing the conduct that created the hostile work

environment to the employer.'" *Id.* (citing *Howley v. Town of Stratford*, 217 F.3d 141,

153-54 (2d Cir. 2000)).

With respect to the aiding and abetting claims, "in order for a defendant to be

liable as an aider and abettor under § 296(6) of the NYSHRL, a plaintiff must first

establish the existence of a primary violation of the NYSHRL by an employer or

principal." *Alvarado v. United Hospice, Inc.*, No. 20-CV-10790 (KMK), 2022 WL

4485379, at \*21–22 (S.D.N.Y. Sept. 27, 2022). Where there are no successful underlying

NYSHRL claims, the aiding and abetting claims fail. *Id.*

Plaintiff here fails to withstand summary judgment against her on this claim. As

previously stated, the numerous alleged statements, primarily by Kaczynski, underlying

Plaintiff's claims of race and national origin discrimination do not rise to the level that a

reasonable jury could find constitutes a hostile work environment. In addition to the

alleged racial statements made by Kaczynski discussed above, the Court also considers

the allegations of national origin (which significantly overlap with the factual allegations

underlying the Section 1981 claims) and sex discrimination alleged by Plaintiff.

With respect to sex-based discrimination, Plaintiff's allegations primarily rely on

statements and actions by her co-workers. Plaintiff argues:

> Here, Plaintiff stated that there were many examples of sexual comments
> from Roldan and Barrera that would be innumerable and they constantly
> talked about their sex lives. (Pl. 56.1 ¶ 337, 52, 227.). Most significantly
> Roldan and Barrera did not have these conversations or gestures with male
> employees. (Pl. 56.1 ¶ 244, 241.). Kaczynski, Roldan and Barrera talked
> about Plaintiff's weight, female stereotypes, Plaintiff's appearance as a

24

> woman and a wife, female body parts, having the male coworker perform fellatio on them or them masturbating and asking if Plaintiff did it. (Pl. 56.1 ¶ 241, 222-223, 228, 232-246.). Also Kaczynski would call women bitches and didn't care that Plaintiff found it offensive and then he thought he could just give Plaintiff a hug unwelcomed. Kaczynski called Roldan a bitch (Pl. 56.1 ¶ 224-225, 227, 282, 284.). Defendants perpetuated a campaign to harass plaintiff on the basis of her sex. Talking about male coworker sticking his tongue in their vaginas and masturbating is objectively and subjectively offensive, something that a reasonable person would find hostile or abusive.

ECF No. 118, at 30.

Similar to Plaintiff's Section 1981 claims, these allegations were not severe or pervasive enough to create an objectively hostile work environment. *See Wells-Williams v. Kingsboro Psychiatric Ctr.*, No. 03-CV-134(CBA), 2007 WL 1011545, at *6 (E.D.N.Y. Mar. 30, 2007) (finding that workers using obscene comments and making obscene gestures was insufficient to establish a hostile work environment). The Court also does not find that the alleged behavior was necessarily *because* of Plaintiff's sex. *See id.* (finding that the record was insufficient to establish that the environment would be different if Plaintiff was male). Therefore, the Court does not find that any reasonable jury could find Plaintiff has a sufficient claim for a hostile work environment under the NYSHRL.

Given that there is no primary claim that sufficiently proves a violation of NYSHRL, the additional aiding and abetting claims for violating the NYSHRL also fail.

### D.   Retaliation Under the NYSHRL

The Court employs a similar analysis for retaliation under the NYSHRL as it does retaliation under Section 1981 claims: "(1) that she engaged in protected participation or opposition . . . , (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between

the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *See Zheng-Smith,* 486 F. Supp. 3d at 623.

Similar to the Section 1981 claims, the Court does not find sufficient evidence of retaliatory acts, nor evidence that retaliation intent drove any of the alleged claimed acts by the Defendants.[16]

### E.    Remaining Arguments

Defendants assert additional arguments in their motions for summary judgment, including issues concerning damage, credibility, and determinations of imputing liability.  Based on the foregoing recommendation that the Court grant the motions for summary judgment as to the Section and 1981 and NYSHRL claims, "the Court need not address [D]efendants' other arguments." *Brady v. Top Ships Inc.*, No. 17-CV-4987, 2019 WL 3553999, at *17 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom*. *Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020).

## V.    CONCLUSION

The Court recommends to Judge Seybert that motions for summary judgment at DEs 102 and 103 be GRANTED and the case be dismissed with prejudice against all the Defendants.

---

[16]    Defendant Geller has also moved for summary judgment on the grounds that Geller was not Plaintiff's employer, the Geller Defendants did not harass or retaliate against Plaintiff, the alleged harassment and retaliation cannot be imputed to the Geller Defendants, the Geller Defendants did not aid or abet the alleged unlawful conduct, and Gubelli cannot be held liable (in addition to incorporating the arguments of the Ballyshear Defendants).  ECF No. 103-1.  Plaintiff argues that Geller should be considered Plaintiff's employer (as they directly hired and fired her), is a single employer with Ballyshear, and is a joint employer with Ballyshear.  ECF No. 110, at 12-18.  Based primarily on the Section 1981 and NYSHRL allegations referenced above, and the claim that Gubelli did not investigate her complaints to human resources, Plaintiff alleges retaliation against Geller and Gubelli.  However, for the same reasons referenced above, the Court does not find a hostile work environment, nor retaliatory behavior.  Therefore, these claims also fail as to Gubelli and Geller.

## VI.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Seybert.  FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS.  *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).


Dated: Central Islip, New York
            January 13, 2023

SO ORDERED:

/s/ Lee G. Dunst
LEE G. DUNST
United States Magistrate Judge

27